# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| COURTNEY C. DIXIE, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )  CAUSE NO. 3:07-CV-31-TS |
| | ) |
| ED BUSS, | ) |
| | ) |
| Respondent. | ) |

## OPINION AND ORDER

Courtney C. Dixie, an Indiana prisoner, is serving an aggregate 95-year sentence for murder and being a habitual offender. He has filed this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction and sentence. The Respondent argues that the Petition should be denied because Dixie's claims are either procedurally defaulted or fail on the merits. For the reasons stated below, the petition is denied.

## FACTS

In deciding this habeas petition, the court must presume the facts set forth by the state courts are correct. 28 U.S.C. § 2254(e)(1). It is Dixie's burden to rebut this presumption of correctness with clear and convincing evidence. *Id.* In affirming the denial of Dixie's post-conviction petition, the Indiana Court of Appeals set forth the facts regarding Dixie's convictions as follows:

> In April 1998, Dixie was charged with murder for stabbing his ex-girlfriend Vickey Gallespie to death in the presence of their infant child. In June 1998, Dixie's appointed counsel, John Bohdan, filed notice of a possible insanity defense under Ind. Code § 35-36-2-1 and stated he believed "there to be a genuine issue as to [Dixie's] competence to stand trial."

1

The trial court appointed Dr. John Rathburn, a psychiatrist, and Dr. Stephen Ross, a psychologist, to determine whether Dixie was sane at the time of the offense and presently competent to stand trial. Both doctors concluded Dixie was sane at the time of the offense. They also agreed Dixie understood the nature of the charges against him and the proceedings. Their opinions diverged, however, with respect to Dixie's ability to assist counsel.

Dr. Rathburn stated: "At the time of examination, Mr. Dixie appeared impaired in his ability to assist his counsel in the conduct of his defense." He also noted:

> Because Mr. Dixie has manic disorder, his judgment and ability to control his flow of speech in his own best interest will be impaired. This is illustrated by the extreme difficulty I experienced in getting him to focus on the events of April 9. I think the average attorney would experience even more difficulty than I did.
>
> Based on my difficulties interviewing this man, I conclude that his ability to act cooperatively with his attorney is significantly impaired. I also believe that his ability to act in his own interest would be similarly impaired. In particular, he would be likely to impulsively blurt out information without regard to the advice of his attorney, or to his own best interest. He would also be impaired in making considered judgments about choosing a strategy and following the advice of his attorney.

Dr. Ross examined Dixie two weeks later. In his report, Dr. Ross stated:

> The defendant has a fairly good understanding of the legal system based upon his previous involvement. He seems to understand how he can be defended against the charges lodged against him as 'my attorney can give me legal advice and counsel.' . . . . He understands the concept of plea bargaining. He understands the need to respond to the judge in an appropriate manner. When asked if he has confidence in his attorney, he stated, 'I have confidence in God, he's the one I believe in.' He did admit that he has confidence in Mr. Bohdan though he should see me [sic] more often in jail. The defendant felt that he is not able to access his attorney as much as he wanted. The defendant stated that he understood the process of any court hearings that have ensued since his arrest. He understood his role as a defendant to 'help my lawyer as best as I can in proving my innocence, letting him know the facts of the case.' . . . . It is this evaluator's opinion of the defendant that he has a fairly good understanding of the legal process and is not experiencing any deficits in his understanding of the judicial system, which would require remediation at this point.

Dr. Ross also noted: 'Dixie is a very suspicious individual though it does not appear as though it would interfere with his ability to trust his attorney at this time. . . . He currently understands the charges that are lodged against him, has at least a modicum of trust in his attorney, and has a fairly solid working knowledge of the legal system.'

Dixie's motion and the doctors' reports were discussed at a status hearing on September 25, 1998. The trial court began by asking: 'Based on those reports, do you wish to have a hearing? On competency to stand trial?' Attorney Bohdan responded, "[B]oth reports suggest that my client is not incompetent to stand trial. They both believe that insanity is not present.' Attorney Bohdan then explained a third doctor, Dr. Kepes, had diagnosed Dixie as a paranoid schizophrenic a few years before the murder and this had prompted him to file the notice regarding insanity and competency. He confirmed Dr. Ross had been provided with a copy of Dr. Kepes' report and suggested Dr. Kepes be deposed to learn more about his early diagnosis. The Court responded: 'Okay. Well is there any need to calendar Mr. Dixie for any other hearings prior to trial?' Attorney Bohdan responded:

> Judge, I guess at this point I have to portray a little bit of my inexperience in this regard. For the record, this is the first case where I have filed a notice on an insanity defense or a potential insanity defense. Procedurally, perhaps it would be advisable for me to request a hearing and maybe we can have the three gentlemen come in. I've just never done this before, Judge, quite frankly.

He further explained he wasn't sure if competency, in a procedural sense, was an issue of fact for trial. The State disagreed with the suggestion Dr. Kepes be part of a competency hearing because his evaluation of Dixie was 'well before the alleged murder of Ms. Gallespie occurred and certainly well before we stand her in court today,' and Drs. Ross and Rathburn had been appointed to do the present evaluation. The following colloquy then ensued:

> COURT: Well and I guess I'm just not very artfully asking this question, gentlemen. Do we need a full blown competency hearing? Because both of these doctors seem to indicate that Mr. Dixie is competent to stand trial. Now. . . you've got an issue on insanity, that's your presentation during trial.
>
> BOHDAN: Okay. No, I guess in light of a little clarification, Judge, I don't think we need a competency hearing.

The trial court stated: 'I'm comfortable finding Mr. Dixie competent to stand trial based on the reports. I don't see the need to have doctors come in and tell me what they're going to tell me from the stand, which is what they've told me in

rather lengthy detailed reports.' No separate competency hearing was held. [DE 5-10 at 2-5, *Dixie v. State*, No. 02A04-0511-PC-611 (Ind. Ct. App. Sept. 25, 2006).] Dixie subsequently waived his right to a jury trial, and a bench trial was held. Dixie took the stand in his own defense. He admitted to stabbing Gallespie in the head and throat while their infant child slept nearby. He stated that he had "snapped" after Gallespie picked up a knife and approached him with it while the two were arguing. [DE 8 at 557-60.] He testified that he had been acting in self-defense, but after the stabbing he got scared and ran out of the house when he heard Gallespie's other daughter calling, "[M]omma are you alright?" from her bedroom. [DE 8 at 559, 595-60.] In connection with the habitual offender charge, Dixie admitted that he had prior convictions for rape and battery, as well as a domestic battery conviction involving Gallespie. [DE 8 at 570.] Dixie was convicted of all charges and sentenced to an aggregate term of 95 years. [DE 5-10 at 5.]

Dixie appealed, arguing that he did not knowingly and intelligently waive his right to a jury trial. [DE 5-4.] The Indiana Supreme Court affirmed. [DE 5-6, *Dixie v. State*, 767 N.E.2d 257 (Ind. 2000).] In rejecting Dixie's arguments, the Indiana Supreme Court stated the relevant facts as follows:

> On October 29, 1998, defense counsel filed a notice of intent to waive the defendant's right to a jury trial and a request for a hearing on the matter. At a hearing on October 30, 1998, the trial court engaged in the following colloquy with the defendant regarding waiver:
>
> COURT: Okay. Mr. Dixie, based on what your attorney has told me, Sir, you do not wish to have your case decided by a jury?
>
> THE DEFENDANT: Right.
>
> COURT: You wish to waive jury and go to the bench . . . or to the Court.

> THE DEFENDANT: Right.
>
> COURT: Alright. You understand, Mr. Dixie, that you have an absolute constitutional right guaranteed to you by the United States as well as the Indiana State Constitution to have a jury of your peers determine your case?
>
> THE DEFENDANT: Yes I do.
>
> COURT: And you don't wish that to occur?
>
> THE DEFENDANT: No.
>
> The trial court then held a bench conference with counsel to discuss the defendant's earlier claims of ineffective assistance of his trial counsel in relation to the waiver. In this conference, defense counsel explained that the defendant's decision on the waiver was against his advice. The trial court addressed the defendant: 'Your attorney has indicated on the record, Mr. Dixie, that this isn't his idea to waive jury. That this is your idea . . . And I want to confirm again with you, Mr. Dixie, that this is, in fact, something you wish to do.' The defendant responded, 'Yes.' The trial court entered a finding that the waiver was knowing, intelligent, and voluntary. Immediately before trial, the trial court again asked the defendant if he wanted to waive his right to a jury trial and have the case tried before the court, and the defendant replied affirmatively.

[DE 5-6 at 3.] Based on these facts, the Indiana Supreme Court determined that Dixie had knowingly and intelligently waived his right to a jury trial, and affirmed his conviction and sentence in all respects. [*Id.*]

On March 14, 2001, Dixie filed a petition for post-conviction relief alleging various claims, including ineffective assistance of trial counsel in connection with the competency issue. [DE 5-2; DE 8, Appx. to Appellant's Brief at 14–19, 38–43.] In April 15, 2005, the post-conviction court held a hearing on Dixie's petition, at which his trial counsel testified, as did the two doctors who had examined him prior to trial. [DE 8, Post. Convict. Tr.] On September 30, 2005, the court denied Dixie's petition. [DE 5-2 at 14.] Dixie appealed, arguing that he was denied effective assistance of counsel when trial counsel waived his right to a full competency

5

hearing. [DE 5-8.] The Indiana Court of Appeals affirmed. [DE 5-10.] Dixie filed a petition for transfer to the Indiana Supreme Court, which was denied. [DE 5-11; DE 5-2 at 14.]

On January 24, 2007, Dixie filed this federal habeas corpus petition raising two claims: (1) his trial counsel was ineffective; and (2) his jury trial waiver was not knowing and voluntary. [DE 1 at 3.]

## LEGAL STANDARDS

This petition is governed by the provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA allows a district court to issue a writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The court can only grant an application for habeas relief if it meets the requirements of 28 U.S.C. § 2254(d), which provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under this deferential standard, a federal habeas court must "attend closely" to the decisions of state courts and "give them full effect when their findings and judgments are consistent with federal law." *Williams v. Taylor*, 529 U.S. 362, 383 (2000). A state court decision is "contrary to" federal law if the state court arrives at a conclusion opposite to that

reached by the Supreme Court or if the state court reaches an opposite result in a case involving facts materially indistinguishable from relevant Supreme Court precedent. *Bell v. Cone*, 535 U.S. 685, 694 (2002). A federal court may grant habeas relief under the "unreasonable application" clause if the state court identifies the correct legal principle from Supreme Court precedent but unreasonably applies that principle to the facts of the petitioner's case. *Wiggins v. Dixie*, 539 U.S. 510, 520 (2003). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be "objectively unreasonable." *Id.*

Before considering the merits of a habeas petition, a federal court must ensure that the petitioner has exhausted all available remedies in the state courts. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). The exhaustion requirement is premised on concerns of comity; the state courts must be given the first opportunity to address and correct violations of their prisoner's federal rights. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004). For that opportunity to be meaningful, the petitioner must fairly present his constitutional claims in one complete round of state review. *Baldwin v. Reese*, 541 U.S. 27, 30–31 (2004); *Boerckel*, 526 U.S. at 845.

The companion procedural default doctrine, also rooted in comity concerns, precludes a federal court from reaching the merits of a habeas petition when either: (1) the claim was presented to the state courts and was denied on the basis of an adequate and independent state law procedural ground; or (2) the claim was not presented to the state courts and it is clear those courts would now find the claim procedurally barred under state law. *Coleman v. Thompson*, 501 U.S. 722, 735 (1991); *Perruquet*, 390 F.3d at 514. When a habeas petitioner fails to fairly present his claim to the state courts and the opportunity to raise that claim has now passed, the

7

claim is procedurally defaulted. *Boerckel*, 526 U.S. at 853–54.

A habeas petitioner can overcome a procedural default by showing both cause for failing to abide by state procedural rules and a resulting prejudice from that failure. *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *Wrinkles v. Buss*, 537 F.3d 804, 812 (7th Cir. 2008), *cert. denied*, 129 S. Ct. 2382 (2009). Cause sufficient to excuse procedural default is defined as "some objective factor external to the defense" which prevented a petitioner from pursuing his constitutional claim in state court. *Murray v. Carrier*, 477 U.S. 478, 492 (1986). A habeas petitioner may also overcome a procedural default by establishing that the court's refusal to consider a defaulted claim on the merits would result in a fundamental miscarriage of justice. *House v. Bell*, 547 U.S. 518, 536 (2006); *Coleman*, 501 U.S. at 750. Under this narrow exception, the petitioner must establish that "a constitutional violation has resulted in the conviction of one who is actually innocent of the crime." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). A petitioner who asserts actual innocence "must *demonstrate* innocence; the burden is his, not the state's." *Buie v. McAdory*, 341 F.3d 623, 626–27 (7th Cir. 2003) (emphasis in original).

## ANALYSIS

### A. Claim One

In claim one, Dixie alleges that his trial counsel, John Bohdan, was ineffective as follows:

> Trial counsel failed to advocate the Petitioner's right to a jury trial, and coerced the mentally incompetent Petitioner into a bench trial; Trial Counsel failed to object and move the court for a full competency hearing when one court-appointed expert declared the Petitioner incompetent. Counsel was ineffective for

failing to move for a competency hearing including the testimony of mental health professionals and for stipulating to the defendant's competency when there was a reasonable probability that defendant was incompetent at the time of trial.

[DE 1 at 3.]

"The Sixth Amendment entitles criminal defendants to the 'effective assistance of counsel'—that is, representation that does not fall below an objective standard of reasonableness in light of prevailing professional norms." *Bobby v. Hook*, 130 S. Ct. 13, 16 (2009). To establish ineffective assistance of counsel under the governing Supreme Court case, *Strickland v. Washington*, 466 U.S. 668 (1984), the petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced him. The court's review of counsel's performance under *Strickland* is "highly deferential," and the petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Davis v. Lambert*, 388 F.3d 1052, 1059 (7th Cir. 2004). The prejudice prong requires the petitioner to show that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Where it is expedient to do so, a court may resolve an ineffective assistance claim based solely on the prejudice prong; in other words, where the petitioner cannot establish prejudice, there is no need to consider in detail whether counsel's performance was constitutionally deficient. *See Strickland*, 466 U.S. at 697; *Watson v. Anglin*, 560 F.3d 687, 689–90 (7th Cir. 2009).

Although ineffective assistance of counsel is a single ground for relief no matter how many failings the lawyer is purported to have displayed, *Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005), each ground of ineffective assistance is considered a separate claim for purposes of analyzing § 2254's exhaustion requirement, *see Stevens v. McBride*, 489 F.3d 883,

894 (7th Cir. 2007) (noting that "[a]dequate presentation of a claim to the state courts requires the petitioner to present both the operative facts and the legal principles that control each claim"). Accordingly, the court addresses each claim individually to determine whether Dixie has properly asserted it through one complete round of state court review. The Court will then address on the merits any aspects of counsel's performance that were exhausted in state court.

Dixie first claim that Bohdan was ineffective because he "failed to advocate the Petitioner's right to a jury trial, and coerced the mentally incompetent Petitioner into a bench trial." [DE 1 at 3.] Putting aside the fact that the record shows Dixie waived his right to a jury trial against the advice of counsel [*see* DE 5-6 at 2], Respondent argues that this claim is procedurally defaulted because it was never raised before the state courts. [DE 6 at 13.] A review of the record reveals that Dixie did not raise this claim in state court. Although he raised grounds of ineffective assistance in his post-conviction petition, he did not allege this specific ground. [*See* DE 5-8, 5–10, 5–11; DE 8, Appx. to Appellant's Brief, at 14–21 and 38-43.] As stated above, each ground of ineffective assistance is considered separate, and "the failure to alert the state court to a complaint about one aspect of counsel's assistance will lead to a procedural default." *Stevens*, 489 F.3d at 894; *see also Johnson v. Hulett*, 574 F.3d 428, 432 (7th Cir. 2009) (to exhaust an ineffective assistance claim the petitioner must have "identified the specific acts or omissions of counsel that form the basis for her claim of ineffective assistance."). Because Dixie did not raise this specific ground of ineffective assistance in one complete round of state review, the claim is procedurally defaulted. Dixie does not allege any grounds in his Traverse for excusing this procedural default, and instead focuses on the merits of this claim. [*See* DE 13 at 20–25.] However, because this claim is defaulted, the Court cannot reach the claim on the merits.

10

Dixie next asserts that counsel was ineffective in failing to request a full competency hearing and otherwise abandoning this issue prior to trial because there was a "reasonable probability that defendant was incompetent at the time of trial." [DE 1 at 3.] This claim was fully exhausted in the state courts. [*See* DE 5-8, 5-10, 5-11.] The last reasoned state court decision was that of the Indiana Court of Appeals affirming the denial of Dixie's post-conviction petition. [DE 5-10.] The Indiana Court of Appeals properly identified the *Strickland* standard as governing the resolution of this claim. [DE 5-10 at 7.] Accordingly, the court must determine whether the state court's application of *Strickland* was unreasonable.

A defendant is competent to stand trial as long as he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960). The Indiana Court of Appeals concluded that Dixie failed to establish that Bohdan's performance fell below an objective standard of reasonableness on the issue of his competency, particularly in light of Dr. Ross's evaluation finding him competent. [DE 5-10 at 8.] The record supports this conclusion.

At the post-conviction hearing, Dr. Rathburn testified that at the time of his evaluation in July 1998, he believed Dixie was suffering from a mood disorder, specifically "mania."[1] [DE 8, Post-Convict. Tr. at 20.] He testified that Dixie was not "severely manic" during their meeting, that he was able to hold a conversation with Dixie for a period of nearly two hours, and that "there was no sense that he was very agitated or in any way hostile or aggressive during the

---

[1] Dr. Rathburn's report indicated that he disagreed with Dr. Kepes that Dixie was suffering from schizophrenia. [DE 8, Appx. to Appellant's Brief, at 45–47.]

conversation." [*Id.* at 23.] He further noted that Dixie was not suffering from any hallucinations or delusions. [*Id.* at 25.] He opined that mania could be successfully treated with psychotropic medications within 30 to 60 days. [*Id.* at 20–21.] Dr. Rathburn also could not rule out the possibility that the condition could go through cycles and improve on its own within a period of months. [*Id.* at 17.] He opined that at the time of his evaluation Dixie was at least moderately impaired in his ability to consult with counsel, based mainly on his apparent difficulty "keeping his focus on the topic that I was trying to get him to talk about." [*Id.* at 26.] Dr. Rathburn was not able to offer an opinion about whether Dixie was able to "rationally" consult with counsel at that time, and he agreed that Dixie was not totally unable to consult with counsel. [*Id.* at 16–19.]

Dr. Ross also testified at the hearing, stating that Dixie had been cooperative, alert, and oriented during his evaluation. [*Id.* at 39.] He found no evidence of brain damage, depression, or hallucinations, and noted that Dixie's memory was intact. [*Id.*] He noted some delusional thinking related to Dixie's view of his own importance, and also noted that Dixie had difficulty trusting people around him. [*Id.* at 40–42.] Dr. Ross testified that he had reviewed the report of Dr. Kepes diagnosing Dixie with paranoid schizophrenia a few years before the murder, and stated that he disagreed with the report because he did not see any psychotic thinking or other evidence of schizophrenia during his evaluation. [*Id.* at 36, 42–43.] He noted that he saw evidence of antisocial personality disorder or a similar mental illness, as well as a history of substance abuse, but concluded, "I thought he was competent." [*Id.* at 44.]

Bohdan also testified at the hearing. He explained that he first raised the issue of Mr. Dixie's competency because "in my dealings with Mr. Dixie, at least initially, he was somewhat difficult to, I would say, pin down to get him to focus on the case at hand." [*Id.* at 55.] He

12

testified that in retrospect he felt it was a mistake not to pursue the competency issue further. [*Id.* at 60.] His testimony reveals, however, that as it got closer to trial, Dixie was able to focus on the case and aid counsel in his defense. Specifically, Bohdan testified that the two met somewhere between nine to twelve times in preparation for trial, discussing at length the wisdom and viability of an insanity defense and Dixie's self-defense theory, as well as the possibility of arguing for the lesser included offense of manslaughter. [*Id.* at 60–61, 68, 72.] Dixie himself came up with the idea of proceeding to trial before the judge, and although counsel did not agree with Dixie's decision, Dixie clearly articulated his reasoning to him and counsel acknowledged that Dixie's reasons were valid, namely, he was concerned about the ability of a jury to remain unbiased given the heinous nature of the crime and the fact that two children were present during the offense.[2] [*Id.* at 60, 70–71, 78–79.]

Bohdan also testified that Dixie was not delusional in his dealings with him. [*Id.* at 65.] He testified that Dixie's ability to focus on the case and aid in his defense improved significantly as time went on. In ballpark figures, he estimated that while Dixie had a tendency to go off on "tangents" during their conversations about fifty percent of the time when they first began meeting, that improved to approximately ten to fifteen percent of the time as trial approached. [*Id*. at 69.] Bohdan further testified that he was able to filter out "that ten or fifteen percent and concentrate on the eighty-five to ninety percent" that was relevant. [*Id.*]

Dixie's own testimony at trial also belies his claim that he was so mentally impaired that he could not rationally consult with counsel during this period. During his testimony, there

---

[2] In addition to the facts recounted above, the record shows that Gallespie's daughter is the one who found her body shortly after Dixie left, and that she still had the knife sticking out of her head. [DE 8 at 198, 212–15, 347.]

13

were—as Bohdan described it—instances where Dixie got "off track" with irrelevant details, usually when he was asked open-ended questions calling for a narrative. [*Id.* at 61; *see also* DE 8 at 509–601.] However, throughout his testimony Dixie was responsive to questions, appropriate, cooperative, and displayed a good memory of the details leading up to and surrounding the offense. [DE 8 at 509–601.] He was also able to highlight facts that he believed supported his self-defense theory, even in the face of cross-examination by the prosecutor. [*Id.* at 566–601.]

Given Bohdan's testimony at the post-conviction hearing, Dixie's own testimony, and the testimony and reports of the two doctors who examined him, particularly that of Dr. Ross whose examination came later in time, Dixie has not shown that he was denied effective assistance of counsel when Bohdan opted not to pursue the competency issue further. Nor has he shown that in the absence of any error by Bohdan, there is a reasonable probability that the result of the proceeding would have been different, since it is apparent from the record that he was able to rationally consult with counsel and aid in his own defense. The state court's resolution of this claim was not unreasonable, and accordingly the claim is denied.

**B.     Claim Two**

In claim two, Dixie asserts that he was denied a fair trial when the trial court accepted his jury trial waiver because it was not knowing and voluntary. [DE 1 at 3.] The Sixth Amendment guarantees a defendant the right to trial by jury. U.S. CONST. AMEND. VI. A defendant may waive his right to a jury trial "where this action is taken with his express, intelligent consent." *Adams v. United States ex. rel. McCann*, 317 U.S. 269, 277–78 (1942). To be knowing and intelligent, a waiver of the right to jury trial must be done with an understanding of the nature of the right the

defendant is giving up. *Boykin v. Alabama*, 395 U.S. 238, 243–44 (1969).

In rejecting Dixie's jury waiver claim on direct appeal, the Indiana Supreme Court determined that Dixie's own actions demonstrated that he waived his right to a jury trial knowingly and voluntarily. [DE 5-6 at 3–4.] The record supports this conclusion, showing that Dixie took several affirmative steps to waive his right to a jury trial. First, his counsel filed a "notice of intent to waive jury trial," stating that Dixie wished to waive his right to a jury trial. [DE 8 at 78.] Second, Dixie orally waived his right to a jury trial after the trial court advised him of the nature of the right, explained the consequences of waiving that right, and questioned him about the voluntariness of his decision. [DE 5-6 at 3.] Dixie appropriately answered all of the court's questions, indicating that he was fully aware of the consequences, and confirmed that he wished to waive his right to a jury trial. [*Id.*] He also confirmed during that hearing that he was waiving this right against his counsel's advice. [*Id.*] Third, Dixie personally signed a document filed with the court entitled, "Agreement to Waive Jury Trial," in which he expressed his desire to have a bench trial in the proceeding and to waive his right to a jury trial. [DE 8 at 83.] Finally, immediately before trial, the court asked Dixie again whether he wanted to waive his right to a jury trial and proceed to a bench trial, and Dixie confirmed that he did. [DE 5-6 at 3.] Dixie's actions and statements to the trial court indicate that his waiver was knowing and voluntary.

Dixie argues that he could not have possibly given voluntary consent since he was "mentally impaired." [DE 13 at 19.] However, as discussed above, there is evidence in the record showing that Dixie was sane at the time of the offense and sufficiently competent to stand trial notwithstanding his mood disorder. Furthermore, as demonstrated by the testimony of his trial counsel, Dixie evidenced a good understanding of the judicial process, no doubt in part due to

15

his considerable experience with the criminal justice system. Both doctors who examined Dixie also noted that he showed a good understanding of the legal system and understood the proceedings that had occurred in his case to date. [DE 5-6 at 4.] The record also shows that Dixie made his own decision about waiving his right to a jury trial, and that he clearly articulated to his counsel the reasons why he thought it wise to proceed with a bench trial. Although counsel did not agree with Dixie's ultimate decision, he acknowledged that Dixie's reasoning was valid given the disturbing nature of the offense. [DE 8, Post-Convict. Tr. at 60, 70–71, 78–79.] Based on the record, the Indiana Supreme Court's rejection of this claim was not unreasonable.

Dixie also argues that he did not knowingly waive his right to jury trial on the charge of being a habitual offender. [DE 13 at 20.] The Indiana Supreme Court rejected this claim on the merits, and its determination is supported by the record. [*See* DE 5-6 at 4.] Specifically, the record shows that the habitual offender count was part of the same multi-count information, which also charged Dixie with murder and battery. (DE 5-6 at 4.) As stated above, Dixie expressed a clear desire to waive his right to a jury trial several times, including signing a written agreement stating that he waived his right to a jury trial "at each and every stage of the proceedings." [DE 8 at 83.] At the same pretrial hearing in which Dixie expressed a desire to waive his right to a jury trial, the State dismissed the battery count and indicated that it was prepared to proceed with the remaining counts. [DE 5-6 at 4.] There can be little doubt that the parties' intent was to proceed with the remaining counts in a bench trial before the court. Based on the record, the Indiana Supreme Court's rejection of this claim was not unreasonable. Accordingly, claim two is also denied.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus [DE 1] is **DENIED.**

SO ORDERED on December 7, 2009.

                                           s/ Theresa L. Springmann
                                           THERESA L. SPRINGMANN
                                           UNITED STATES DISTRICT COURT
                                           FORT WAYNE DIVISION